**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| PAMELA DAWN HELLINGER,<br><br>               Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>               Defendant. | CASE NO. 1:22-CV-01974-AMK<br><br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION & ORDER** |

Plaintiff Pamela Dawn Hellinger ("Plaintiff" or "Ms. Hellinger") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the matter is before the undersigned pursuant to the consent of the parties.  (ECF Doc. 12.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

## I.      Procedural History

On October 6, 2016, Ms. Hellinger protectively filed a new application for DIB, alleging a disability onset date of March 19, 2016.[1]  (Tr. 102, 184-85.)  She alleged disability due to lupus, fibromyalgia, COPD, high blood pressure, depression, anxiety, Sjogren's Syndrome, neck pain, mixed connected tissue disease, Jaccoud's, arthropathy of hands, Raynaud's, leg problems, sleep apnea, vitamin D deficiency, neuropathy, Baker's cyst, manic depressive disorder, chronic insomnia.  (Tr. 213, 223, 231.)

---

[1] A previous application for DIB benefits was denied in a written decision dated March 18, 2016.  (Tr. 81-96.)

Ms. Hellinger's application was denied at the initial level (Tr. 121-27) and upon reconsideration (Tr. 135-41), and she requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 142).  On July 11, 2018, a hearing was held before an ALJ.  (Tr. 39-77.)  On November 6, 2018, the ALJ issued a decision finding Ms. Hellinger had not been under a disability within the meaning of the Social Security Act from the alleged onset date through Ms. Hellinger's date last insured of December 31, 2017 ("2018 Decision").  (Tr. 7-28; 2026-48.)

On January 21, 2020, the Appeals Council denied Ms. Hellinger's request for review. (Tr. 2049-54.)  Ms. Hellinger appealed to the U.S. District Court, and the case was remanded pursuant to a joint motion to remand on December 11, 2020.  (Tr. 2074.)  On February 10, 2021, the Appeals Council ("AC") remanded the 2018 Decision for resolution of two issues.  (Tr. 2075-78.)  The sole issue relevant to the present appeal was set forth as follows:

> The hearing decision does not contain an adequate evaluation of the opinions from treating physician Douglas Waltman, Ph.D. (20 CFR 404.1527). The Administrative Law Judge acknowledged the opinions from Dr. Waltman and assigned them some weight, noting they were not entirely persuasive as treatment records reveal intact cognition, clear speech, logical thoughts, and good insight/judgment, but notes that other findings support the conclusion that the claimant "experiences some limitation in her ability to maintain concentration, persistence, or pace, and to adapt or manage herself" (Decision, page 12 referencing Exhibits B7F and B8F). However, it is unclear what specific aspects of Dr. Waltman's opinions were found to be entitled weight and which aspects were discredited (20 CFR 404.1527). Further, there is no indication that the Administrative Law Judge considered the length of treatment, nature and extent of treatment relationship, or specialization when evaluating the opinion from Dr. Waltman as required under 20 CFR 404.1527(c). Accordingly, further evaluation of the opinions from treating physician Dr. Waltman is needed.

(Tr. 2077.)  Upon remand, the AC instructed the ALJ to do the following:

- Give further consideration to the treating, nontreating, and nonexamining source opinions pursuant to the provisions of 20 CFR 404.1527, and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the treating and nontreating source provide additional evidence and/or further clarification of the opinion (20 CFR 404.1520b).

2

- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and Social Security Ruling 85-16 and 96-8p).

- Proceed through the sequential evaluation process as needed and appropriate.

(Tr. 2078.)

A new hearing was held on July 19, 2022, before a different ALJ.  (Tr. 1983-2004.)  The ALJ issued a written decision on September 1, 2022, finding Ms. Hellinger had not been under a disability within the meaning of the Social Security Act from the alleged onset date through her date last insured of December 31, 2017 ("2022 Decision").  (*Id.*)  Sixty-five days after it was issued, the 2022 Decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.900(a), 404.984(d).  Ms. Hellinger then filed the pending appeal (ECF Doc. 1), which is fully briefed (ECF Docs. 8, 9, 10).

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Hellinger was born in 1963, making her 54 and an individual closely approaching advanced age on the date last insured.  (Tr. 184, 220.)  She has a high school education (Tr. 278) and previously worked as a catering manager (Tr. 1997) but did not engage in substantial gainful activity from her alleged onset date through her date last insured (Tr. 1989).

### B.    Medical Evidence

Although the ALJ identified severe physical and mental impairments (Tr. 1989), Ms. Hellinger bases her appeal on the ALJ's evaluation of a Mental Status Questionnaire completed by her treating psychologist, Douglas Waltman, Ph.D. (ECF Docs. 8, 10; Tr. 627-29.)  The evidence summarized herein therefore focuses on Ms. Hellinger's mental impairments.  Further,

the evidence summarized is limited to the time period between the alleged onset date of March 19, 2016, and Ms. Hellinger's date last insured, December 31, 2017.  (Tr. 1998.)

### 1.    Relevant Treatment History

Ms. Hellinger initiated mental health treatment at the Charak Center in January 2017, attending psychotherapy and developing an individualized service plan ("ISP") with Ranada Cooper, Psy.D.  (Tr. 663.)  She complained of daily chronic pain and symptoms of depression and frustration due to physicians not communicating with her about medical issues and treatment approaches.  (*Id.*)  Dr. Cooper diagnosed her with major depressive disorder, single episode.  (Tr. 644.)  Thereafter, Ms. Hellinger attended additional psychotherapy sessions with Dr. Cooper or Roman Povroznik, LSW, usually once or twice per month, including: February 13, 2017 (Tr. 662); February 20, 2017 (Tr. 661); March 13, 2017 (Tr. 660); March 27, 2017 (Tr. 653), April 10, 2017 (Tr. 652); April 24, 2017 (Tr. 646); May 15, 2017 (Tr. 645); June 5, 2017 (Tr. 747); August 21, 2017 (Tr. 721); September 11, 2017 (Tr. 715); October 2, 2017 (Tr. 709); and October 18, 2017 (Tr. 698).

On February 13 and 20, 2017, Ms. Hellinger discussed chronic pain and worked with Dr. Cooper on processing feelings and relaxation techniques.  (Tr. 661-62.)  On March 13, 2017, Dr. Cooper encouraged Ms. Hellinger to undergo a psychiatric evaluation and discuss medications. (Tr. 660.)  On March 22, 2017, Douglas Waltman, M.D., of the Charak Center completed a Mental Status Questionnaire (Tr. 627-29), and Rachel Astorino completed a Daily Activities Questionnaire (Tr. 630-31), the substance of which will be discussed in section II.B.2, *infra*.

Ms. Hellinger attended an initial medication management session with Vinod Bhandari, M.D. on March 27, 2017.  (Tr. 654-59.)  She complained of being sad and aggravated for four to five years, with poor energy, poor sleep, and racing thoughts.  (Tr. 655.)  She had been on

4

Cymbalta for three years, which stopped her mind racing but did not help with her depression symptoms.  (*Id.*)  On examination, she was depressed with a constricted affect; all other findings were within normal limits.  (Tr. 657.)  Dr. Bhandari prescribed Seroquel and rated the severity of Ms. Hellinger's illness as "4 = Moderately Ill."  (Tr. 659.)  Ms. Hellinger also attended her first psychotherapy session with LSW Povroznik that same day.  (Tr. 653.)

At psychotherapy with Dr. Cooper on April 10, 2017, Ms. Hellinger reported daily pain and frustration regarding the denial of her Social Security claim.  (Tr. 652.)  She also reported a recent increase of her Seroquel and improved sleep with Seroquel.  (*Id.*)

Ms. Hellinger returned to medication management with Dr. Bhandari on April 24, 2017. (Tr. 647-51.)  She reported that her sleep and racing thoughts were decreased with Seroquel, but her depression had not improved and she continued to have poor energy and motivation.  (Tr. 647.)  She was depressed with a flat affect on examination, but other mental status findings were unremarkable. (Tr. 648.)  She reported mild morning grogginess with her medication.  (*Id.*)  Dr. Bhandari discontinued Cymbalta, started Wellbutrin, and increased her Seroquel dose.  (Tr. 647, 649.)  Ms. Hellinger attended psychotherapy with Dr. Cooper on the same date, where she reported frustration regarding medical issues but processed her feelings appropriately.  (Tr. 646.) Her mood at psychotherapy was dysthymic and her affect was sad and tearful.  (*Id.*)

At psychotherapy on May 15, Ms. Hellinger reported thinking a lot about what she could no longer do, like sweeping an entire room, but worked on reframing her negative thoughts.  (Tr. 645.)  Her mood was labile and her affect was mood congruent.  (*Id.*)  On June 5, 2017, she expressed frustration regarding medical issues but processed feelings appropriately.  (Tr. 747.)

Ms. Hellinger returned to medication management with Dr. Bhandari on June 9, 2017, reporting that her racing thoughts and sleep were better with Seroquel but her depression was

still not better.  (Tr. 742-46.)  She presented as somewhat dysphoric.  (Tr. 742.)  Dr. Bhandari

increased her Seroquel dosage and started Trileptal, finding her minimally improved.  (Tr. 742,

746.)  She returned to Dr. Bhandari on June 23, 2017, reporting less mood swings and less racing

thoughts.  (Tr. 737-41.)  Objectively, Dr. Bhandari noted that she was "[l]ess dysphoric, less

manic."  (Tr. 737.)  He found her to be much improved, and increased Seroquel again.  (Tr. 741.)

Ms. Hellinger next attended medication management with Amanda McIntosh, LPN, on

July 27, 2017.  (Tr. 732-36.)  She reported doing well on Trileptal and Seroquel and denied side

effects, but complained of feeling depressed with crying episodes, mood swings, irritability, and

anxiety with daily panic attacks; she reported low energy and lack of sleep at night.  (Tr. 732.)

LPN McIntosh consulted with Dr. Bhandari, who made all treatment recommendations.  (*Id.*)

Ms. Hellinger's mood was depressed on examination, but all other mental status findings were

unremarkable.  (Tr. 733.)  LPN McIntosh found her to be minimally improved.  (Tr. 736.)

Ms. Hellinger next attended medication management on August 10, 2017, reporting mild

depression, trouble sleeping through the night, and low energy, but denying mood swings or

irritability.  (Tr. 727-31.)  She was doing okay on her medications and denied side effects.  (Tr.

727.)  Her mental status findings were unremarkable, with a euthymic mood.  (Tr. 728.)  She

returned for medication management on August 21, 2017, reporting that her mood had improved

and that her trouble sleeping was due to a pinched nerve in her leg.  (Tr. 722-26.)  She was doing

well on Seroquel and Trileptal and denied side effects.  (Tr. 722.)  Her mental status findings

remained unremarkable.  (Tr. 723.)  She was directed to return in two weeks.  (Tr. 725.)  Ms.

Hellinger also returned to psychotherapy with Dr. Cooper August 21, 2017, reporting continued

frustration with her medical doctors and feeling depressed about her health.  (Tr. 721.)

Ms. Hellinger attended medication management with LPN McIntosh on September 5, 2017, reporting mild depression, irritability, and sleeping only 2-3 hours at a time due to pain. (Tr. 716-20.)  She denied mood swings or anxiety, and reported doing well on Seroquel and Trileptal without side effects.  (Tr. 716.)  Her mental status findings remained unremarkable. (Tr. 717.)  She was directed to return in two weeks.  (Tr. 720.)  She attended psychotherapy on September 11, 2017, complaining of chronic pain, difficulty sleeping, and fatigue.  (Tr. 715.) She returned for medication management on September 22, 2017, complaining of mild depression, generalized anxiety without panic attacks, limited sleep due to pain, and low energy. (Tr. 710-14.)  Her speech was rapid and pressured on examination, but other mental status findings remained unremarkable.  (Tr. 711.)  She was directed to return in two weeks.  (Tr. 714.)

At psychotherapy on October 2, 2017, she complained of breathing difficulties and feeling ill; she was short of breath and was encouraged to seek medical attention.  (Tr. 709.)  She returned to medication management with LPN McIntosh that same day.  (Tr. 704-08.)  She continued to report mild and occasional depression, some generalized anxiety, and low energy, and said her difficulty sleeping related to her chronic pain.  (Tr. 704.)  She denied mood swings and reported doing well on Seroquel and Trileptal with no side effects.  (*Id.*)  Her mental status findings remained unremarkable.  (Tr. 705.)

Ms. Hellinger attended a medication management office visit with Dewan Williams, RN, on October 18, 2017, with her grandson.  (Tr. 699-703.)  RN Williams consulted with Rakesh Ranjan, M.D., who addressed Ms. Hellinger's diagnosis and medications.  (Tr. 699.)  Ms. Hellinger reported hopelessness, depression, anxiety, diminished ability to think or concentrate, flight of ideas, diminished interest in pleasurable activities, and psychomotor agitation.  (*Id.*) Upon consultation with Dr. Ranjan, Ms. Hellinger's diagnosis was changed to bipolar disorder

7

with mixed mood.  (Tr. 699, 702.)  Her mood was depressed, she demonstrated somatic delusions, and her thought processes were circumstantial with flight of ideas, but she was also well groomed and cooperative, with clear speech, full affect, and good insight and judgment. (Tr. 700.)  She was advised to return in one month.  (Tr. 703.)  She also attended psychotherapy with Dr. Cooper on the same day, where she continued to complain of chronic pain and frustration relating to her health conditions.  (Tr. 698.)  Ms. Hellinger informed Dr. Cooper that she was leaving the Charak Center and did not want to be transferred for therapy.  (*Id.*)

Ms. Hellinger returned for medication management with LPN McIntosh on December 12, 2017.  (Tr. 693-97.)  She reported doing fine on her current medications, without side effects, and requested refills.  (Tr. 693.)  However, she also reported feeling more depressed and feeling like she was going to have a break down.  (*Id.*)  Her diagnosis was noted to be major depressive disorder, recurrent, moderate.  (*Id.*)  She was depressed on examination, but other mental status findings were unremarkable.  (Tr. 694.)

2.      **Opinion Evidence**

i.      **Treating Source Opinion – Dr. Waltman**

The Charak Center submitted a Mental Status Questionnaire signed by Dr. Waltman and dated March 22, 2017.  (Tr. 627-29.)  The questionnaire listed January 23, 2017, as the date first seen and March 13, 2017, as the date last seen.  (Tr. 627.)  The questionnaire indicated that Ms. Hellinger was assessed for depression on January 23, 2017, and "received counseling on 1/30/17, 2/13/17, 2/20/17, and 3/13/17."  (Tr. 628.)  The medical records reflect that the described counseling sessions were with Dr. Cooper.  (Tr. 660-63.)  The diagnosis was major depressive disorder, single episode, unspecified, and the duration of the impairment was "unknown" but "at least January 2017."  (Tr. 628.)  The prognosis was fair.  (*Id.*)  Mental status findings included:

well groomed; soft spoken, but normal speech; sad/depressed mood; flat affect; oriented to person, place, time, and situation; and as to cognitive functioning "[p]oor concentration and short-term memory; no other issues reported." (Tr. 627.)  The questionnaire noted Ms. Hellinger did not report issues with anxiety, thinking disorders, insight, judgment, or other behaviors.  (*Id*.)

In the questionnaire, Dr. Waltman opined that Ms. Hellinger: would need to have things explained multiple times because her memory was "not sharp"; had difficulty maintaining attention due to apathy from medication; could complete tasks but was not timely because "[i]t takes her a long time with a high need for rests"; had no social interaction deficiencies but felt safer away from people and when not interacting with others; had a tolerance for change that had decreased over time, and preferred a routine and to be solitary; and had trouble maintaining concentration, and would be unable to keep up with a routine task.  (*Id*.)  Dr. Waltman indicated that Ms. Hellinger would be capable of managing benefits.  (*Id*.)

### ii.    Daily Activities Questionnaire – Ms. Astorino

On March 22, 2017, Rachel Astorino, a case manager for Ms. Hellinger at the Charak Center, provided a Daily Activities Questionnaire.  (Tr. 630-31.)  Ms. Astorino indicated Ms. Hellinger was first seen at the Charak Center on January 23, 2017, and last seen on March 13, 2017, with five total appointments, and was compliant with treatment.  (Tr. 631.)  She reported Ms. Hellinger lived in a house with her husband and needed both the security of her husband's presence and his assistance with her physical health.  (Tr. 630.)  She indicated Ms. Hellinger visited with family two to three times per week, but had to watch instead of participating in activities.  (*Id.*)  Asked to give examples of anything that might prevent work activities, Ms. Astorino reported Ms. Hellinger had a "high need for rests, poor attendance, and multiple physical health problems."  (*Id.*)  In detailing Ms. Hellinger's ability to care for her own needs,

Ms. Astorino reported that she: tried to cook but was unable to cook large meals; performed household chores but had to be careful what tasks she did due to physical pain; had difficulty showering and washing her hair and sometimes stayed in sweatpants; could go shopping once or twice per month; could drive but had trouble getting out of the house; was able to do banking and bill paying; no longer gardened due to pain and apathy; and required assistance from her husband and daughter for meal preparation, chores, and shopping.  (Tr. 631.)

### iii.   Medical Expert Testimony – Dr. Porchia

Tonia Porchia, Psy.D., testified as a medical expert at the 2022 Hearing.  (Tr. 2018-20, *see also* Tr. 2188-96 (Medical Expert's Résumé).)  In preparation for her testimony, she reviewed all medical evidence in the record.  (Tr.  2018.)  Dr. Porchia testified that Ms. Hellinger had severe unspecified bipolar disorder and generalized anxiety disorder (*id*.) but did not have any impairments that met or medically equaled a listing during the relevant period (Tr. 2019).  Dr. Porchia also opined that Ms. Hellinger would be able to function in a low-stress environment with repetitive routine duties where there would not be high-production quotas.  (Tr. 2019-20.)

### iv.   State Agency Psychological Consultant Opinions

On March 27, 2017, state agency psychological consultant Irma Johnston, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 107) and mental RFC assessment (Tr. 110-11).  In the PRT, she concluded that Ms. Hellinger had mild limitations in understanding, remembering, or applying information and moderate limitations in: interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself.  (Tr. 107.)  She then adopted the mental RFC from the May 18, 2016 ALJ decision (Tr. 110-11), which limited Ms. Hellinger to: simple, routine tasks, and tasks that required no more than six months to a year

to learn; and low-stress work, defined as work that did not require high production quotas, piece-rate work, arbitration, confrontation, negotiation, supervision, or commercial driving.  (Tr. 86.)

On June 1, 2017, state agency psychological consultant Kristen Haskins, Psy.D., completed a PRT (Tr. 119) and mental RFC (Tr. 123-25).  In the PRT, Dr. Haskins concluded that Ms. Hellinger had mild limitations interacting with others; otherwise, her PRT findings matched those of Dr. Johnson.  (Tr. 119.)  In the mental RFC, Dr. Haskins opined that Ms. Hellinger could complete short cycle tasks in a setting without fast pace, and had an ability to handle stress and pressure in the workplace that would be adequate to handle tasks without strict time limitations or production standards.  (Tr. 123-25.)  Dr. Haskins opined that Ms. Hellinger was not significantly limited in understanding, memory, or social interaction.  (Tr. 123-24.)  She specified that the mental RFC was not an adoption of the prior ALJ decision because the record no longer contained a diagnosis of anxiety.  (Tr. 125.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony – 2018 Hearing

At the July 11, 2018 hearing, Ms. Hellinger testified that she lived with her husband and relied on her daughter, who did not live with her, to perform household chores and grocery shopping due to her physical impairments.  (Tr. 47-48, 49.)  She could make light lunches, do crock pot meals, and put laundry in the washer.  (Tr. 48.)  She said she lacked the necessary focus to drive and last drove around 2010.  (*Id*.)  She spent her day in a loveseat or recliner taking naps due to trouble sleeping at night, and slept for two to three hours per night.  (Tr. 49, 61.)  She did not interact with others due to her physical impairments, specifically "the over-sensitivity with the sun and the edema, you can't go out much into it."  (Tr. 62.)  She limited

11

herself primarily to indoor or shaded activities, such as assembling puzzles with her grandchildren and watching them play outside from her porch.  (Tr. 64-65.)

Regarding her depression, Ms. Hellinger said she had crying spells and panic attacks in spite of her attempts to remain upbeat.  (Tr. 64-65.)  She had difficulty concentrating and problems with her memory as medication side effects.  (Tr. 63-64.)

### 2.    Plaintiff's Testimony – 2022 Hearing

At the hearing held on July 19, 2022, Ms. Hellinger testified that it became difficult for her to work and stand during the relevant period.  (Tr. 2010.)  When asked why she believed she was disabled, Ms. Hellinger answered that her "biggest issues" were COPD (which made it hard to breathe) and skin sensitivities (which caused hives).  (Tr. 2009-10.)  Ms. Hellinger also reported fatigue.  (Tr. 2010.)

Regarding her mental health, she reported seeing a mental health counselor once per month.  (Tr. 2010-11.)  During the relevant period, she said she experienced anxiety and depression. (Tr. 2011.)  She had lupus for twenty-five years, and her anxiety and depression started when she was no longer able to remain active.  (Tr. 2012.)  Her daughter helped her with housework.  (Tr. 2016.)  She slept approximately two to three hours before waking with racing thoughts.  (Tr. 2017.)  She described depression, anger, and crying during the relevant period due to being unable to be as active as she previously was.  (*Id*.)

### 3.    Vocational Expert's Testimony – 2022 Hearing

A Vocational Expert ("VE") testified at the hearing.  (Tr. 2020-25.)  The VE classified Ms. Hellinger's past relevant work as catering manager, a light, skilled job with an SVP of 7. (Tr. 2020.)  The VE testified that an individual of Ms. Hellinger's age, education, and work experience with the functional limitations described in the ALJ's RFC determination could

perform representative positions in the national economy, including merchandise marker, routine clerk, and information clerk.[2]  (Tr. 2020-22.)  She also testified that off-task time consisting of more than two 15-minute breaks, a 30-minute lunch, and occasional bathroom breaks would be work preclusive, as would absences totaling more than one per month.  (Tr. 2024.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ must follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

---

[2] The VE did not offer testimony as to whether the hypothetical individual could perform Ms. Hellinger's past relevant work as a catering manager.  (Tr. 2020-22.)

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.     The ALJ's Decision

In his September 1, 2022 decision, the ALJ made the following findings:[3]

1.     The claimant last met the insured status requirements of the Social Security Act through December 31, 2017. (Tr. 1989.)

2.     The claimant did not engage in substantial gainful activity during the period from her alleged onset date of March 19, 2016 through her date last insured of December 31, 2017.  (*Id.*)

3.     Through the date last insured, the claimant had the following severe impairments: fibromyalgia, degenerative disc disease, chronic obstructive pulmonary disease (COPD), and major depressive disorder.  (*Id.*)

4.     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 1990.)

5.     After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform

---

[3] The ALJ's findings are summarized.

light work as defined in 20 CFR 404.1567(b), specifically she can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. The claimant can stand/walk for 6 hours of an 8-hour workday. Claimant can sit for 6 hours of an 8-hour workday.  She can frequently push/pull bilaterally, and foot pedal is constant bilaterally.  She can occasionally use ramps and stairs, but never use ladders, ropes or scaffolds. The claimant can occasionally stoop, kneel, crouch and crawl.  She can frequently handle, finger, and feel bilaterally in all planes. She must avoid high concentrations of cold, smoke, fumes, pollutants and dust.  Claimant must avoid entirely dangerous machinery and unprotected heights. Claimant can do no complex tasks but can do simple (routine) tasks, meaning claimant has the basic mental aptitude to meet the demands of competitive, remunerative, unskilled work including the abilities to, on a sustained basis, understand, carry out, and remember simple instructions. Claimant can do detailed but not complex tasks.  The claimant can make simple work-related decisions.  The claimant can respond appropriately to supervision, coworkers, and usual work situations; and can deal with changes in routine work settings.  Claimant can focus attention on simple or routine work activities for at least 2 hours at a time and can stay on task at a sustained rate such as initiating and performing a task that they understand and know how to do.  The claimant can work at an appropriate and consistent pace and can complete tasks in a timely manner.  She can ignore or avoid distractions while working.  The claimant can change activities or work settings without being disruptive.  Claimant can do no high production quotas or piece rate work.  The claimant can have superficial and occasional interactions with public and co-workers, meaning the claimant is limited to speaking, signaling, taking instructions, asking questions and similar contact but with no arbitration, negotiation, confrontation, supervision or commercial driving.  (Tr. 1992-93.)

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565). (Tr. 1995.)

7.    The claimant was born on July 10, 1963 and was 54 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).  (Tr. 1997.)

8.    The claimant has at least a high school education.  (*Id.*)

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  (*Id.*)

10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that

existed in significant numbers in the national economy that the claimant could have performed.  (*Id.*)

Based on the above, the ALJ found Ms. Hellinger was not under a disability, as defined in the Social Security Act, from March 19, 2016, the alleged onset date, through December 31, 2017, the date last insured.  (Tr. 1999.)

## V.  Plaintiff's Argument

In her sole assignment of error, Ms. Hellinger argues that the ALJ's mental RFC determination is not supported by substantial evidence because he failed to properly weigh Dr. Waltman's treating psychiatric opinion.  (ECF Doc. 8, pp. 3, 10; ECF Doc. 11.)

## VI.  Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that she failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006)

(citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    Sole Assignment of Error: Whether Mental Limitations in RFC are Supported by Substantial Evidence Given ALJ's Assessment of Treating Provider Opinion**

In her sole assignment of error, Ms. Hellinger argues that the ALJ's mental RFC determination is not supported by substantial evidence because he failed to properly weigh Dr. Waltman's treating psychiatric opinion, disregarding the order of the Appeals Council. (ECF Doc. 8, pp. 10-11.) Specifically, she argues the ALJ: (1) failed to provide a proper consistency analysis, "providing only conclusions"; (2) failed to discuss supportability, "only not[ing] a short

17

treating relationship"; and (3) disregarded the AC order by failing to "consider[] all the relevant factors before assigning evidentiary weight." (*Id.* at pp. 12-13.)  The Commissioner responds that the ALJ "considered all regulatory factors and identified substantial evidence for assigning little weight to Dr. Waltman's opinion," noting that the ALJ was required to *consider* all regulatory factors but was not required to *discuss* every factor in his decision or to present his analysis of those factors in "a single, tidy paragraph." (ECF Doc. 9, pp. 10, 14.)

### 1.    Legal Framework for Consideration of Treating Psychologist Opinion

Under the governing regulations, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in the case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ gives a treating source's opinion less than controlling weight, she must provide "good reasons" for the weight she assigns. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).  In deciding the weight to be given, the ALJ should consider: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

The "good reasons" provided by the ALJ "must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight

the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).  However, an ALJ is not required to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec.,* 414 F. App'x 802, 804 (6th Cir. 2011); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017) ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion.") (citing *Francis*, 414 F. App'x at 804-05).

Generally, courts applying the treating physician rule have focused on whether the ALJ considered the appropriate factors and provided "good reasons" for the weight given to the treating source opinion, not whether the ALJ strictly adhered to *Gayheart's* two-step framework. *See Aiello-Zak v. Comm'r of Soc. Sec.*, 47 F. Supp. 3d 550, 558 (N.D. Ohio 2014) ("[R]ecent authority has held that so long as an ALJ adequately addresses the factors required by *Gayheart* and articulates good reasons for discounting the opinion of a treating source, the Commissioner's decision will not be upset by a failure to strictly follow the *Gayheart* template."); *Hawkins v. Comm'r of Soc. Sec.*, No. 5:20-CV-1245, 2021 WL 2227380, at *12 (N.D. Ohio June 2, 2021) ("[C]ourts are increasingly less strict in demanding two clearly separate analyses in cases of treating source opinions, but have been satisfied when the ultimate decision as to weight, regardless of the precision of its formation, considers the *Gayheart* factors and is supported by good reasons.") (citation omitted); *see also Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 553 (6th Cir. 2020) (applying "good reasons" analysis even where ALJ had found the treating source opinion "was not based on a treating relationship").

19

**2.      Whether ALJ Erred in His Analysis of Dr. Waltman's Opinion**

In remanding the 2018 Decision, the AC found the ALJ had not adequately evaluated Dr.

Waltman's opinion in that decision because he assigned the opinion "some weight" and found it

"not entirely persuasive," but his analysis did not make it clear "what specific aspects of Dr.

Waltman's opinions were found to be entitled weight and what were discredited."  (Tr. 2077.)

The AC also noted there was "no indication that the [ALJ] considered the length of treatment,

nature and extent of treatment, or specialization" when evaluating the opinion.  (*Id.*)  Therefore,

the AC ordered the ALJ to "[g]ive further consideration to the treating, nontreating, and

nonexamining source opinions pursuant to the provisions of 20 CFR 404.1527, and explain the

weight given to such opinion evidence" on remand.  (Tr. 2078.)

On remand, the ALJ provided the following analysis of Dr. Waltman's opinion:

> Douglas Waltman, Ph.D., completed a mental status questionnaire on March 21,
> 2017. Claimant was first seen on January 23, 2017. She had received counseling
> four times. Claimant had a diagnosis of major depressive disorder, single episode,
> unspecified, unknown onset of impairment, at least January 2017. Dr. Waltham
> wrote that the claimant needs to have things explained to her multiple times because
> her memory is not sharp. Meanwhile, Dr. Waltman concluded that the claimant has
> no deficiency in social interaction but noted that she feels safer away from people
> and not interacting with others. Claimant has difficulty maintaining attention due
> to apathy from her medications. The claimant can complete tasks but not in a timely
> fashion due to a high need for breaks. Claimant has experienced a decreased
> tolerance for change over time, preferring a routine and to be solitary. Claimant has
> trouble maintaining attention and would be unable to keep up with a routine task [].
> The Appeals Council's remand order indicated the hearing decision did not contain
> an adequate evaluation of this opinion []. I give this opinion little weight because it
> is not consistent with the evidence of record. Claimant had only started counseling
> in January 2017, approximately two months prior to this opinion. There was not a
> long-term treating relationship with the claimant.

(Tr. 1996 (citations omitted) (emphasis added).)  Unlike the 2018 Decision, the ALJ did not

assign "some weight" while failing to specify what aspects of the opinion were entitled to weight

and what was discredited; instead, he assigned "little weight" to the entire opinion.  (*Compare*

Tr. 21 *with* Tr. 1996.)  Also unlike the 2018 Decision, the ALJ noted that Ms. Hellinger had

started counseling two months before Dr. Waltman's opinion, attending only four sessions, and that Dr. Waltman thus did not have a long-term treating relationship with Ms. Hellinger.  (*Id.*)

In challenging the ALJ's analysis of Dr. Waltman's opinion, Ms. Hellinger first argues that the ALJ "failed to explain why he found Dr. Waltman's opinion inconsistent with the other evidence of record, opting instead to simply conclude that it was."  (ECF Doc. 8, p. 14.)  The Commissioner responds that the ALJ's analysis of the relevant factors "need not be contained in a single, tidy paragraph," and the "decision as a whole should be read with common sense" under *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449 (6th Cir. 2016).  (ECF Doc. 9, p. 14.)

The Sixth Circuit has repeatedly held that an ALJ need not discuss treatment records a second time when explaining why an opinion is inconsistent with the record, so long as he "listed them elsewhere in [his] opinion."  *Crum*, 660 F. App'x at 457 (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *see Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to require the ALJ to "spell out every fact a second time").

Here, the ALJ discussed the specific complaints and objective findings recorded in Ms. Hellinger's mental health treatment records in his Step Three analysis, explaining:

> In understanding, remembering, or applying information, the claimant had a mild limitation.  Treatment records reveal that the claimant consistently presented in mental health visits with intact cognition and good insight/judgment [].  In addition, treatment records consistently reveal that the claimant denied having issues with memory and there is no documentation of positive clinical signs related to this area of functioning [].

> In interacting with others, the claimant had a moderate limitation.  A counselor concluded that the claimant had no deficiencies in social functioning in a medical source statement from March 2017 [].  In addition, a caseworker noted that the claimant interacted well with others in her past jobs.  Claimant visited with family 2-3 times a week [].

> With regard to concentrating, persisting, or maintaining pace, the claimant had a moderate limitation.  Claimant complained of decreased concentration, racing

thoughts, and poor sleep during counseling sessions [].  However, she is able to handle her own medical care.

As for adapting or managing oneself, the claimant had experienced a mild limitation.  Claimant reported difficulty with sleep and racing thoughts, but she was generally well groomed.

(Tr. 1991-92 (citations omitted).)  The ALJ provided further discussion of her mental health complaints and treatment records at Step Four, as follows:

Claimant also testified she saw mental health professionals about once a month at the Charak Center.  She saw a doctor and a caseworker.  Claimant testified she became depressed due to physical limitations.

***

As to her mental impairments, claimant was diagnosed with major depressive disorder, single episode, in January 2017 [].  On October 2, 2017, claimant reported she was doing well on Seroquel and Trileptal with no side effects.  She reported mild and occasional depression with some generalized anxiety.  She denied mood swings.  She was not sleeping well due to chronic pain.  Her thought process was logical.  Judgment was fair and insight was average [].  On October 18, 2017, claimant reported insomnia, diminished ability to think or concentrate, flight of ideas, feeling pressured to talk, depressed mood, diminished interest in pleasurable activities and psychomotor agitation.  Her diagnosis was changed to bipolar disorder [].  By December 2017, claimant's depression was classified as moderate and recurrent [].  Claimant's sleep improved and racing thoughts decreased with the addition of Seroquel.  By December 2017, claimant denied sleep disturbance, racing thoughts, anxiety or excessive crying [].

(Tr. 1993-95 (citations omitted).)  The ALJ also considered and discussed the psychiatric opinions of the state agency psychiatric consultants and medical expert Dr. Porchia, giving "great weight" to Dr. Porchia's findings, which were based on a review of the complete record, and "some weight" to the state agency consultants' opinions, finding that the record supported additional mental limitations in the ability to deal with others.  (Tr. 1995-96.)

It was in the context of this broader discussion and analysis of the evidence that the ALJ found Dr. Waltman's opinions—including his opinions that Ms. Hellinger: needed things explained multiple times because her memory was not sharp, had trouble maintaining attention

and would be unable to keep up with a routine task, and could not timely complete tasks because of "a high need for breaks"—were "not consistent with the evidence of record."  (Tr. 1996 (citing Tr. 628).)  As to memory limitations, the ALJ had already analyzed the subjective and objective evidence supporting his finding that Ms. Hellinger had no more than mild limitations in understanding, remembering, or applying information.  (Tr. 1991.)  As to limitations in maintaining attention and completing tasks, the ALJ had separately analyzed the subjective, objective, and opinion evidence supporting his findings of no more than moderate limitations in those functional areas and his adoption of moderate mental RFC limitations that included an ability to perform "simple (routine) tasks."  (Tr. 1991-96.)  In this context, the Court finds that Ms. Hellinger has not met her burden to show that the ALJ's analysis of consistency lacked the support of substantial evidence or was inadequately articulated.

Ms. Hellinger's argument that "there is a difference between considering evidence and articulating how we consider evidence" (ECF Doc. 8, p. 14 (quoting 82 Fed. Reg. 5844-01, at 5858)) does not change this analysis.  First, the cited language explicitly refers to later revisions to the regulations applicable in this case.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01.  Second, the ALJ's discussion of the relevant evidence in his Step Three and Four analyses did not simply list medical findings, but instead discussed the subjective and objective contents of Ms. Hellinger's medical records in support of the ALJ's findings that she was subject to mild and/or moderate mental limitations that were not consistent with the more severe limitations articulated in Dr. Waltman's opinion.

Ms. Hellinger's second argument challenging the ALJ's analysis of Dr. Waltman's opinion is that the ALJ "failed to provide any form of supportability analysis" and "simply claimed the opinion was inconsistent with other evidence and noted an admittedly short

treatment period." (ECF Doc. 8, p. 14.)  In support, he relies on regulations that were not in effect when Ms. Hellinger's application was filed in 2016.  (*Id.* (citing 20 C.F.R. § 404.1520c).)  But supportability was also a relevant factor under the regulations applicable here.  20 C.F.R. § 404.1527(c)(3).  Under the "supportability" factor:

> The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.

*Id.*  Other factors to be considered in evaluating medical opinions under the applicable regulations include the examining relationship of the medical source, the treatment relationship of the medical source—including the length, nature, and extent of the treatment relationship and the frequency of examinations, the consistency of the opinion with the record as a whole, the specialization of the medical source, and other relevant factors.  20 C.F.R. § 404.1527(c).

As discussed above, the ALJ's finding that Dr. Waltman's opinions were "not consistent with the evidence of record" (Tr. 1996) was made in the context of a broader discussion of the evidence supporting that finding; that evidence included the treatment records from the Charak Center that were referenced in Dr. Waltman's opinion (*see* Tr. 1991, 1994-95 (citing Tr. 640-63), (same)).  The Court also notes that the regulations applicable in this case do not contain the requirement set forth in the more recent regulations that the ALJ should "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions . . . in [his] . . . decision."  *Compare* 20 C.F.R. § 404.1520c(b)(2) *with* 20 C.F.R. § 404.1527(c).

Under the regulatory framework and "treating physician rule" applicable in this case, the Court's analysis must focus on whether the ALJ considered the relevant factors and provided "good reasons" for the weight given to treating opinions, and not on his strict compliance with any articulated framework.  *See Aiello-Zak*, 47 F.Supp.3d at 558; *Hawkins*, 2021 WL 2227380 at

*12.  Here, the ALJ described the evidence he relied on in finding Ms. Hellinger's mental limitations to be mild or moderate in nature—rather than the more severe limitations described in Dr. Waltman's opinion—and also appropriately noted that the relevant treating relationship spanned approximately two months and four counseling visits at the time the opinion was rendered, so that "[t]here was not a long-term treating relationship" with Ms. Hellinger.  (Tr. 1996.)  In the context of the decision as a whole, the Court finds the ALJ sufficiently articulated "good reasons" to support the weight he gave to Dr. Waltman's opinion, and his findings were supported by substantial evidence.  Ms. Hellinger has not met her burden to prove otherwise.

Ms. Hellinger's citation to the Sixth Circuit's decision in *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004) does not change this analysis.  (ECF Doc. 8, pp. 13-14.)  The ALJ in *Wilson* considered the treating opinion but held: "while 'this opinion may be an accurate assessment of [Wilson's] current limitations, the undersigned must assess the claimant's limitations on . . . the date he was last insured for benefits.'"  *Wilson*, 378 F.3d at 545.  The court found this explanation did not provide "good reasons" because substantial evidence did not support a finding that the opinion only assessed current limitations, and because the ALJ did not address whether the opinion was supported by objective medical evidence or inconsistent with other evidence in the record, did not identify supporting evidence, and did not explain his application of the regulatory factors.  *Wilson*, 378 F.3d at 545-46; *see also Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008) (noting "the ALJ in *Wilson* rejected the opinion of the claimant's treating physician without providing any explanation").  Here, in contrast, the ALJ's decision identified and discussed the objective medical findings and record evidence supporting the weight given to the opinion and sufficiently addressed the regulatory factors.

Ms. Hellinger's final argument is that the ALJ "disregarded the [AC]'s orders and failed to properly evaluate Dr. Waltman's opinion by considering all the relevant factors before assigning evidentiary weight."  (ECF Doc. 8, pp. 12-13.)  But she does not identify specific orders from the AC that the ALJ allegedly disregarded.  She is apparently referencing the AC's general order for the ALJ to consider the medical opinions under the applicable regulations and explain the weight given to the opinion evidence.  (*See id.* at pp. 13-15; Tr. 2078.)  As discussed above, the ALJ's findings on remand specifically addressed the concerns articulated by the AC as to the assignment of "some weight" without specifying what parts of the opinion were entitled to weight and the prior failure to address the length of treatment and nature and extent of the treating relationship.  (*See* Tr. 2077; c*ompare* Tr. 21 *with* Tr. 1996.)  To the extent that Ms. Hellinger is simply rearticulating prior arguments regarding the ALJ's analysis of the opinion under applicable regulations, the argument fails for the same reasons discussed above.

For the reasons set forth above, the Court finds that the ALJ articulated "good reasons" sufficient to support the little weight he gave to Dr. Walton's opinion and sufficiently complied with the AC remand order, and further finds that Ms. Hellinger has not met her burden to show that the ALJ's mental RFC finding lacked the support of substantial evidence.  Accordingly, the Court finds Ms. Hellinger's sole assignment of error to be without merit.

## VII.   Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.


Dated: July 24, 2024


/s/*Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge


26